**U.S. FIRE INSURANCE COMPANY, Appellant,**

v.

**Lesa REARDEN, Individually, and as Next Friend of Charles L. Rearden, Appellee.**

No. 08–85–00031–CV.

Court of Appeals of Texas, El Paso.

July 31, 1985.

Bruce Bangert, Shafer, Gilliland, Davis, McCollum & Ashley, Odessa, for appellant.

G. Bert Smith, Jr., G. Bert Smith, Jr., Inc., Andrews, for appellee.

Before WARD, OSBORN and SCHULTE, JJ.

## OPINION

SCHULTE, Justice.

This is a workers' compensation case involving a question of whether an injury suffered in the course of employment was a producing cause of a subsequent heart attack which resulted in the worker's death. Petitioner Lesa Rearden was awarded a judgment against U.S. Fire Insurance Company for death benefits under the Workers' Compensation Act pursuant to a favorable jury verdict. We affirm.

The decedent, Jerry Rearden, was injured while working for Sharp Pipe and Supply Company when the blade of a bulldozer snapped the chain that was securing it and the blade fell on his back. Immediately after this accident, on April 21, 1983, Mr. Rearden was taken to the hospital in Andrews and treated by Dr. Jariwala. At that time, Mr. Rearden was forty-three years of age, 5'8" tall and weighed 170 pounds. Mr. and Mrs. Rearden both testified (Mr. Rearden by earlier deposition) that Mr. Rearden had been in good health prior to this accident and had never experienced any heart problems. The admitting diagnosis revealed that Mr. Rearden had sustained severe contusions and abrasions to the shoulder blade area, numbness of the entire left side of his body, pain in the left shoulder and back, muscle spasms in the neck and lumbar region, blunt trauma to the thoracic region and paresis in the left upper extremity. Mr. Rearden also sustained lacerations and abrasions about the face as a result of being pinned face down to the ground by the blade of the bulldozer. It appears that when he was pinned by the blade, a rock "mashed" all of his teeth back into his head requiring their later removal. Another rock also "mashed" into his face right below the left eye causing the left side of his face to become numb. There was no evidence of brachial neuritis, possible heart disease or heart difficulties.

Mr. Rearden remained hospitalized in Andrews, Texas, for about five days and then was referred to Dr. Meek, a neurological surgeon in Odessa, Texas. Dr. Meek recorded Mr. Rearden's complaints of pain in his neck and shoulders, numbness in the left arm, left thumb and index finger and pain across the anterior portion of the chest. Mr. Rearden also exhibited atrophy in the bicep of his left arm which indicated pressure on the nerves in his neck. Dr. Meek did a myelogram and recommended major surgery which was ultimately performed on May 18, 1983. The surgical procedure was called a cervical laminectomy designed to help alleviate the pain and underlying pressure on the nerves. Dr. Meek admitted that the surgery did not relieve Mr. Rearden's pain as he had anticipated and that he could not explain Mr. Rearden's apparent "progressive downhill course."

Lesa Rearden, the decedent's wife, testified concerning Mr. Rearden's post-operative condition. She testified that he could not rest, sleep or eat. He was in a lot of pain and could not lie down. He had the hiccups for about nine or ten days and saw Dr. Lauderdale in an attempt to cure them. He had also lost considerable weight, as much as forty pounds. Mr. Rearden was very concerned about his inability to work and support his family financially. In addition, Mr. Rearden's son was in a near fatal flash fire on June 13, 1983. This necessitated taking their son to the Shriner's Hos-

pital in Galveston. Mr. Rearden was in so much pain at this time that Mrs. Rearden wrote Dr. Meek a letter requesting that he refer her husband to a doctor in the Galveston area. Dr. Meek replied "[w]e are sorry. No treatment needed. I don't know any neurosurgeon there."

Mr. Rearden's lawyer then referred him to a neurosurgeon in New Mexico since he continued to have constant pain. Dr. Groves had Dr. Kankanala run some tests on Mr. Rearden. Their findings were suggestive of brachial neuritis on the left side involving almost all the branches. He had pain in his shoulders, left arm and back. He also exhibited numbness in his left arm, thumb and index finger, left side of his face, and right lateral thigh. Mr. Rearden also exhibited a "marked atrophy" of his left biceps muscle. Mrs. Rearden testified that before the decedent got hurt he had "huge" biceps and that after the accident the top part of his arm wasted away until it became as small as his wrist. Dr. Groves recommended physical therapy in Andrews which Mr. Rearden took five days per week up until the day he died. Mr. Rearden never returned to work after the accident.

Two days before his death, Mr. Rearden gave his oral deposition complaining of the same maladies as have been previously discussed. On December 18, 1983, approximately eight months after Mr. Rearden's accident at work, he began to have chest pains and was taken to the emergency room at Andrews Hospital where he was pronounced dead by Dr. Jariwala. Apparent cause of death was acute myocardial infarction.

■ Workers' Compensation Death Benefits are recoverable regardless of the interim time between the accidental injury and the death if there is shown a causal relation between the injury and death in that the injury was a concurring, contributing or producing cause of the death. *Insurance Company of North America v. Myers*, 411 S.W.2d 710 (Tex.1966). When the contention is made that there is no evidence to support the jury finding as to the existence of producing cause, the Court

of Appeals must consider only the evidence and inferences which tend to support the jury finding and disregard all evidence and inferences to the contrary. *Stodghill v. Texas Employers Insurance Association*, 582 S.W.2d 102, 103 (Tex.1979); *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951). Therefore, only the evidence that is favorable to the finding of the jury that the injury was a producing cause of Jerry Rearden's death will be considered in the determination of a no evidence point.

■ It is undisputed that Mr. Rearden suffered a compensable injury in the course of his employment due to the accident that occurred on April 21, 1983. Appellee, however, seeks death benefits under the Workers' Compensation Act on the basis that the injuries suffered in the accident caused or aggravated her husband's heart condition thereby causing a heart attack and death. The Appellee contends that the pain and stress which ensued from the original injury in April was a producing cause of the subsequent heart attack which occurred eight months later. The causal base of a heart attack and the theory of its traumatic aggravation are subjects of dispute in the medical profession. Whether an injury and its ensuing pain and stress activated and accelerated a pre-existing heart condition is a question of science determinable only from the testimony of expert medical professionals. A causal connection in such a fact situation must rest in reasonable probabilities; otherwise, it is no more than speculation and conjecture. "Reasonable probability, in turn, is determinable by consideration of the substance of the testimony of the expert witness and does not turn on semantics or on the use by the witness of any particular term or phrase." *Myers*, supra at 713. So long as the substance of the expert's opinion lies in reasonable medical probability, these "magic words" are not deemed necessary. *Stodghill*, supra at 105.

The testimony of two physicians support the jury finding that the injury sustained by the decedent was a producing cause of

Jerry Rearden's death. Dr. Jariwala testified as to the reasonable medical probability that the accident and the result thereof was one of the producing causes of Rearden's death. Jariwala had previously testified that although Rearden exhibited no symptoms of a heart disease or a heart condition prior to his death, Rearden's x-rays suggested that he had arteriosclerosis, or hardening of the arteries. However, Jariwala also testified that medically, as people get older it is normal for them to exhibit some calcification or hardening of the arteries. The fact that Mr. Rearden may have had arteriosclerosis is not in dispute. Appellee contends that so long as this pre-existing condition, if any, was aggravated by the injury, the injury could be deemed a producing cause of the decedent's heart attack. In any event, Jariwala, who was not only the original treating physician but also the medical attendant at Rearden's death, testified that in reasonable medical probability, the injury and the result thereof was one of the producing causes of death. And when asked on cross-examination whether in reasonable medical probability the stress resulting from the injury contributed to the decedent's death, Jariwala testified:

Q. All right. Now, when you say "may," would you say "reasonable medical probability"?

A. That's correct.

Jariwala made this determination on the basis of a hypothetical which assumed that Mr. Rearden had arteriosclerosis, smoked one to one and a half packs of cigarettes a day, had a history of heart disease in his immediate family, had the type of accident Mr. Rearden experienced and had the same type of pain, stress and injuries that have already been previously discussed.

Dr. Kantor, called by the Plaintiff, who did not ever see the deceased but testified from records, stated that "beyond any doubt" the medical probability would be that the stress and pain from the injury was a producing cause of the decedent's death. Dr. Kantor made this determination on the basis of the decedent's medical records and a hypothetical that was much the same as the one that was given to Dr. Jariwala.

The Texas Supreme Court in *Stodghill,* supra, has previously dealt with the same fact situation as appears in the case at hand. In *Stodghill,* the Court found that an accidental on-the-job fall injuring the worker was a producing cause of his death from a myocardial infarction forty-seven days later. It was held that where the substance of the testimony of the doctor was that it was probable that the stress resulting from the worker's fall, when superimposed upon an existing arterial hypertension, was a producing cause of the worker's death, such testimony, "though strongly rebutted by other testimony and circumstances, constitutes some direct evidence of probative force of the causal connection between the injury and the death" and was sufficient to withstand a "no evidence" allegation. *Stodghill,* supra at 105; See also: *Lucas v. Hartford Insurance and Indemnity Company,* 552 S.W.2d 796 (Tex.1977); *Otis Elevator Company v. Wood,* 436 S.W.2d 324 (Tex.1968).

Where there is direct evidence of the vital fact in the record, the Court of Appeals need not concern itself with the scintilla rule nor with inferences in regard to a "no evidence" point. *Lucas,* supra at 797. The vital fact in this case is whether, in reasonable medical probability, the injury that the decedent sustained was one of the producing causes of his death. Two physicians, both Dr. Jariwala and Dr. Kantor, answered this question in the affirmative. Since the substance of the testimony of the expert witnesses was based in terms of medical "probabilities" and not "possibilities," the testimony was not only admissible but also constituted some probative evidence to withstand the appellant's "no evidence" contentions. Points of Error Nos. One, Two, Four and Six are overruled.

Appellant next contends that the evidence was factually insufficient to support the findings of the jury.

Where the challenge to a jury finding is framed as an "insufficient evidence"

point, we are to consider all the evidence in the case, both that in support of and that contrary to the finding, to determine if the challenged finding is so against the great weight and preponderance of the evidence as to be manifestly erroneous or unjust. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). If the court so determines, the finding should be set aside and a new trial ordered. Id.

In considering an "insufficient evidence" point, we must remain cognizant of the fact that it is for the jury, as the trier of fact, to judge the credibility of the witnesses, to assign the weight to be given their testimony, and to resolve any conflicts or inconsistencies in the testimony. *Taylor v. Lewis*, 553 S.W.2d 153, 161 (Tex.Civ.App.—Amarillo 1977, writ ref'd n.r.e.). This Court may not substitute its judgment for that of the jury if the challenged finding is supported by some evidence of probative value and is not against the great weight and preponderance of the evidence. *Alford, Meroney & Co. v. Rowe*, 619 S.W.2d 210, 213 (Tex.Civ.App.—Amarillo 1981, writ ref'd n.r.e.).

*Commonwealth Lloyd's Insurance Company v. Thomas*, 678 S.W.2d 278, 289 (Tex. App.—Fort Worth 1984, ref'd n.r.e.).

The substance of the medical conclusions that appear in the record as to the producing cause of Jerry Rearden's death can be summarized as follows:

1. Dr. Jariwala, who was called by the plaintiff, was the original treating physician and the medical attendant at death. He testified that in reasonable medical probability, the stress resulting from the injury contributed to, and was a producing cause of, the decedent's death.

2. Dr. Meek, called by the defendant, was the treating doctor who had performed the operation on the deceased. He first testified that he did not think there was any connection between the pain and stress the decedent was experiencing and the subsequent heart attack. But later, on cross-examination, Dr. Meek acknowledged that stress was a factor which could produce or aggravate a heart condition and admitted that he did not have the expertise to form an opinion as to whether the pain and stress that the decedent had experienced was a producing cause of his death. He could not explain Mr. Rearden's "progressive downhill course."

3. Dr. Mohr, called by the defendant, who never treated or saw the deceased, but testified from records, did not think there was any connection between the heart attack and the pain Mr. Rearden experienced. Dr. Mohr explained the differences between Type A and Type B personalities and how these two types of personalities deal with stress differently. He also explained the differences between chronic pain and stress and acute pain and stress. Dr. Mohr was of the opinion that since the decedent suffered from "blunt trauma" and chronic pain, the resulting stress could not have been a producing cause of the heart attack.

4. Dr. Kantor, called by the plaintiff, who never treated or saw the deceased, but testified from records, stated that "beyond any doubt" the medical probability would be that the stress and pain from the injury was a producing cause of the decedent's death.

This is not a case where the causal connection must be inferred by the jury from their general experience and common sense. Nor is this a case where circumstantial evidence is needed in order to establish that it was an on-the-job accidental injury that was the cause of the fatal heart attack. *Stodghill*, supra at 105. Here, there was direct medical testimony supporting the finding of the jury that the injury was a producing cause of the decedent's death. Despite the fact that there was conflicting medical testimony, there was sufficient evidence in the record to support the jury finding. Points of Error Nos. Three and Five are overruled.

■ Appellant asserts in its last point of error that the trial court erred in overruling defendant's motion to correct judgment since it was entitled to a credit pursuant to

Tex.Rev.Civ.Stat.Ann. art. 8306, sec. 8b (Vernon 1967). This statute reads as follows:

> Sec. 8b. In case death occurs as a result of the injury after a period of total or partial incapacity, for which compensation has been paid, the period of incapacity shall be deducted from the total period of compensation and the benefits paid thereunder from the maximum allowed for the death. Acts 1917, p. 269.

This statute was in existence at the time of Mr. Rearden's injury on April 21, 1983. Effective May 17, 1983, the 68th Legislature amended the above cited statute by adding the following provision:

> (b) Section 8b does not apply to lifetime death benefits as provided by Section 8 of this article but applies only to those beneficiaries receiving 360 weeks of benefits.

Tex.Rev.Civ.Stat.Ann. art. 8306, sec. 8b(b) (Vernon Supp.1985). This amendment did not state whether it was to apply retroactively.

The question for determination is whether the May 17, 1983, amendment to Article 8306, sec. 8b, supra, is applicable to a claim for injury arising before, and a claim for death tried after, the effective date of the amendment. Regarding this amendment in May of 1983, Section 2, the emergency provision of the 1983 amendatory act, provides in part: "[i]t is uncertain and has not been judicially determined whether the offset provided by Section 8b, Article 8306, Revised Civil Statutes of Texas, 1925, applies to the lifetime benefits provisions of Section 8 of that article. The fact that no judicial interpretation resolving the conflict exists creates an emergency ...."

Plaintiffs were not entitled to pursue a cause of action for death benefits until December 18, 1983, the date of the injured worker's death. When the injured worker died, a new cause of action arose. *Trans-Continental Insurance Company v. Walsh,* 621 S.W.2d 461 (Tex.Civ.App.—Waco 1981, no writ). The date of the new cause of action for death benefits, therefore, arose well after the effective date of the amendment to Article 8306, sec. 8b. This amendment disallowed any credits to lifetime death benefits. Therefore, the credit was properly disallowed. Appellant's Point of Error No. Seven is overruled.

The judgment is affirmed.